OPINION OF THE COURT
Ethel B. Danzig, J.
Pursuant to CPLR 2304 and 3103, the Mount Sinai School of Medicine and the American Cancer Society move to quash subpoenae duces tecum, and for a protective order denying discovery requested by R. J. Reynolds Tobacco Company. The moving parties argue that they are entitled to this relief on the grounds (a) that the materials sought to be discovered are either absolutely privileged, or (b) if qualifiedly privileged, that the burden of producing the material far outweighs the need for it.
The material is sought in connection with the case of Page v Lincoln Elec. Co., presently pending in California. Mrs. Page is claiming in that case that her husband’s smoking and exposure to asbestos had a multiplicative effect in causing his cancer and subsequent death. The Mount Sinai Hospital and American Cancer Society and their medical personnel are not parties to the action pending in California.
Reynolds anticipates that plaintiff Page’s expert will testify that the data relied upon for his or her opinion is contained in certain articles published in 1968, 1978 and 1979. These studies were authored by Dr. Irving J. Selikoff and his colleagues who allegedly based their analysis on some of the data subpoenaed. The studies conclude that persons exposed to asbestos are more likely to get cancer if they also smoke, than if they do not.
After a commission had been issued by the California court, Reynolds made an ex parte application to the Supreme Court in New York for the issuance of subpoenae duces tecum which was granted. Mount Sinai School of Medicine and the American Cancer Society then moved this court to quash the subpoenae and for protective relief.
The subpoenae request production of data, tapes, documentation relating to interviews, questionnaires, medical records, death certificates, X rays, autopsies and computer tapes, as well as previous or follow-up studies using a subset or superset of data covering the medical investigations. The subpoenae also seek material which reach into the present, ongoing medical research activities of Dr. Selikoff, Mount Sinai Hospital and the American Cancer Society.
*284 A subpoena should readily identify the material sought with reasonable precision depending upon the individual case. Enumeration of documents may, however, not be necessary and a class description may be sufficient. (Hale v Henkel, 201 US 43; Matter of Sun-Ray Cloak Co., 256 App Div 620; Smith v Russo-Asiatic Bank, 170 Misc 408; Matter of Trombetta v Van Amringe, 156 Misc 307, 310.) Reynolds’ subpoenae, however, are not selective. Rather, they are sweeping and indiscriminate.
A subpoena may be challenged on the grounds that it is overbroad, burdensome or oppressive. (Matter of La Belle Creole Intl. v Attorney-General of State of N. Y., 10 NY2d 192; Wehringer v Volvo of Am. Corp., 55 AD2d 558 [1976]; Cunningham & Kaming v Nadjari, 53 AD2d 520.) A subpoena may be vacated for reasons of privilege, whether statutory or constitutional, or having its genesis under common law. (See, People v Iannaccone, 112 Misc 2d 1057, dealing with Civil Rights Law § 79-h [commonly referred to as the Shield Law]; McGowan v Metropolitan Life Ins. Co., 234 App Div 366, appeal dismissed 259 NY 454, dealing with the Department of Health and records of communicable diseases.)
CPLR 3101 provides that "[t]here shall be a full disclosure of all evidence”, which means all relevant information calculated to lead to relevant evidence. (West v Aetna Cas. & Sur. Co., 49 Misc 2d 28, 29.) The data requested must be material and necessary although it need not be indispensible. (Allen v Crowell-Collier Publ. Co., 21 NY2d 403, 407.) The rules of evidence may be considered when determining necessity of the requested material. But inadmissibility by itself may not be a reason for denying access to the information, since such information may lead to evidence. In addition, its use in cross-examination can be a consideration.
Mount Sinai and the American Cancer Society argue that over the past 20 years Reynolds could have conducted its own medical investigations on the subject. Yet the fact that the information is available from other sources or even that Reynolds has or could have obtained the material needed at trial is not reason alone for denying the production of the data. Material subpoenaed may be used for corroborative purposes.
However, when compliance with subpoenae would be so oppressive as to hinder the normal functioning of a department of the medical school and/or of the American Cancer *285 Society for a prolonged period of time, the court on motion or on its own initiative may provide appropriate relief.
This is especially so because Mount Sinai and the American Cancer Society are complete strangers to the underlying litigation. Neither Dr. Selikoff nor his coauthors will be witnesses at the Page trial. They are not consultants in that matter, nor was decedent Page a subject of their medical investigation.
Under CPLR 3103 (a), the court may make a protective order "designed to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.”
Policy in New York, unlike most other jurisdictions, has accorded privilege to experts (see, People ex rel. Kraushaar Bros. & Co. v Thorpe, 296 NY 223, holding that an expert cannot be compelled to give his opinion as an expert against his will). The United States Supreme Court held in the notable case of Branzburg v Hayes (408 US 665, 688 [1972]) "that 'the public . . . has a right to every man’s evidence,’ except for those persons protected by a constitutional, common-law or statutory privilege” (citing United States v Bryan, 339 US 323, 331).
If the production of the material would become oppressive and unreasonably burdensome, the court, in balancing the hardships, should consider whether there are other sources for obtaining the material needed to disprove the conclusions reached by the three studies. In addition, the probative value of the material, if produced, should be considered.
Robert Piziali, a mechanical engineer, who submitted an affidavit on behalf of Reynolds, expressing an opinion on a medical subject, albeit of a statistical nature, avers that he can find no other sources on the subject in controversy. On the other hand, Dr. Selikoff and Dr. Landrigan of Mount Sinai Medical School have shown that there are other available medical sources dealing with the subject.
In balancing competing values in this medical area, the question presented is whether the tobacco industry, after years of inactivity, should be permitted to salvage their legal defenses at the expense of some of the world’s leading medical investigators.
Under subpoena are 324 linear feet of material contained in 97 file cabinet drawers in 19 separate file cabinets and 250 bound volumes. The 18,170 individuals who participated in the study, either personally or through their labor unions, re *286 quested and received promises of confidentiality in return for their cooperation in the medical research. About 4,000 of these individuals were physically examined and advised by Dr. Selikoff in his professional capacity as a physician. According to CPLR 4504 (a), unless a patient waives the privilege of confidential information, which is not the situation here, Dr. Selikoff is not permitted to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.
Dr. Selikoff determined by a sample test that it would take thousands of hours to redact all the material which is of a confidential nature. The time required would be the same whether the information is in raw data form or on computer tape.
Reynolds has offered to reimburse Mount Sinai and the American Cancer Society for the reasonable expenses incurred in their complying with the subpoenae. However, it appears that Dr. Selikoff and his colleagues would still have to spend over 1,000 hours of time removing the data identifying the individuals who participated in the study. The loss of the scientists’ time in complying with the subpoenae would be an unreasonable burden and would unduly interrupt their ongoing medical investigations.
It is also clear that the medical material requested is not of an archival nature but rather is in constant use as part of ongoing medical research.
Reynolds’ actual need for the material appears to be seriously diminished by the statement in its reply papers that "Mount Sinai and the American Cancer Society are well aware that the mass of material accumulated by Dr. Selikoff and his colleagues during the course of the studies is not needed by Reynolds to evaluate the studies’ conclusions” (emphasis supplied).
The three Selikoff studies were conducted under accepted medical procedures and subjected to several peer reviews prior to their publication. Nevertheless, Reynolds’ mechanical engineers would like to inspect the raw data in the hopes of finding that "ministerial errors” occurred in transmitting the data to computer tapes. They further contend that it is possible that their inspection would reveal more fundamental flaws than mere "ministerial errors”.
A great deal of the material used as a basis for the studies’ *287 conclusions, such as X rays, slides and medical reports are no longer in the possession of Mount Sinai or the American Cancer Society, having been returned to the providers. In addition, the medical conditions of the individuals who participated in the studies have certainly undergone changes over the 20-year span. Some of the participants have even died and a verification of the research in the three published articles would be virtually impossible at this time.
The actual physical production of the computer tapes, which are small in size but contain great quantities of information, would not present any hardship. However, the content of the material on the tapes is no longer in the same form as was used for the published studies, since the prior confidential data has now been mixed and infused with new material generated by the ongoing research and investigations.
Mount Sinai and the American Cancer Society protest, on behalf of their medical scientists, the interference with their ongoing scientific research in this area. While these medical investigations are still in progress, they should not be subjected to examination and criticism by people whose interests are arguably antithetical to the medical scientists. It would have the effect of denying to these doctors the opportunity of first publication of their studies. It could also have a chilling effect and discourage future scientific endeavors.
Mount Sinai, the American Cancer Society, the Dean at the Yale University School of Medicine, and other eminent medical scholars claim that forced compliance with the subpoenae would result in an interference with their academic freedom. It was stated in Dow Chem. Co. v Allen (672 F2d 1262, 1275 [1982]) that "whatever constitutional protection is afforded by the First Amendment extends as readily to the scholar in the laboratory as to the teacher in the classroom.” Of course, like all other constitutional rights, academic freedom is not absolute and must be balanced against competing interests. (See, e.g., Barenblatt v United States, 360 US 109.) For present purposes, respondent’s interest in academic freedom may properly figure into the legal calculation of whether forced disclosure would be reasonable.
For the reasons stated above, the court finds that compliance with the subpoenae would place an unreasonable burden upon the medical and scientific institutions involved and *288 would unduly disrupt the ongoing research at both Mount Sinai and the American Cancer Society.
Accordingly, the motion to quash the subpoenae is granted.
The cross motion of Reynolds to depose the custodians of the records at Mount Sinai and the American Cancer Society to elicit information on confidentiality is also denied.